IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| RONALD McCLARY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:18CV959 |
| ) | |
| MARK SHUMAN, et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court for a recommended ruling on Defendants Mark Shuman, Eric Scott and Queen Gerald's motion for summary judgment. (Docket Entry 58.) Plaintiff Ronald McClary filed a brief in opposition to Defendants' motion. (Docket Entries 67, 68.) For the reasons that follow, the undersigned will recommend that Defendants' motion for summary judgment be granted.

**I. BACKGROUND**

Plaintiff filed the Complaint in this action alleging a violation of his civil rights pursuant to 42 U.S.C. § 1983. (Complaint ("Compl."), Docket Entry 2; *see also* Am. Compl., Docket Entry 4.[1]) Plaintiff essentially alleges that, while housed at Scotland Correctional Institution ("Scotland"), Defendant Shuman failed to provide Plaintiff with a required special food diet,

---

[1] Plaintiff's amended pleading includes a step two grievance response, a clinical encounter note, and medical lab testing results. It does not include any additional factual allegations regarding Plaintiff's claims.

causing Plaintiff's health conditions to worsen including incurring substantial weight loss. (Compl. at 3-4.)[2]  Plaintiff further alleges that Defendants Gerald and Scott also ignored his dietary needs.  (*Id.*)  As a result of Defendants' alleged deliberate indifference, Plaintiff seeks compensatory and punitive damages.  (*Id.* at 4.)

On January 12, 2021, Defendants filed a motion for summary judgment, arguing that there are no genuine issues of material fact which support Plaintiff's claim of an alleged violation of his constitutional rights.  (Docket Entry 58.)  At the outset, Defendants note that Plaintiff is not only a serial filer of claims within the federal courts, but also within the North Carolina Industrial Commission ("Industrial Commission").  (Docket Entry 59 at 1-2.) Having filed numerous claims without merit, the Industrial Commission issued a "Gatekeeper Order" requiring Plaintiff to obtain a Rule 11 certification from a licensed attorney indicating that any newly proposed Industrial Commission claim has merit.  (*See* Industrial Commission Order, Docket Entry 59-1.)  Among other things, the Gatekeeper Order found that Plaintiff had filed a total of 54 claims with the Industrial Commission between August 14, 2015 and January 22, 2020, fifteen of which dealt with Plaintiff allegedly not receiving his prescribed special diet.  (*See id.* ¶ 3.)  The Industrial Commission further noted that "out of Plaintiff's claims that have reached a final disposition by the date of this Order, twenty-two (22) have been dismissed or denied and seven (7) have been voluntarily dismissed by Plaintiff."  (*Id.*) Defendants in the pending federal action contend that the issue here is "one of [Plaintiff's]

---

[2]  All citations in this recommendation to documents filed with the Court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

primary, reoccurring complaints as referenced in the Gatekeeper Order," and like Plaintiff's other cases, is not meritorious. (Docket Entry 59 at 2.)

In further support of their motion for summary judgment, Defendants each submitted declarations on their behalf. (*See* Mark Shuman Declaration, Docket Entry 60-1; Queen Gerald Declaration, Docket Entry 60-2; Eric Scott Declaration, Docket Entry 60-3.) Defendant Shuman, now retired, was previously employed with the North Carolina Department of Public Safety ("NCDPS") as a Food Service Manager III at Scotland at the time of the matters alleged in the Complaint. (Shuman Decl. ¶¶ 3-4.) While familiar with Plaintiff and his alleged dietary needs, the issue of special dietary needs of inmates and the determination, diagnosis and prescription of a special dietary needs meal is not something that Defendant Shuman, other food service personnel, or custodial staff, are involved in. (*Id.* ¶¶ 5-6.) Rather, such decisions regarding special diets are determined by medical "Providers" such as doctors, physician assistants or nurse practitioners. (*Id.* ¶ 7.) Defendant Shuman states that sometimes Providers do confer with a dietician, but the final determination is made by the Provider. (*Id.*) Providers, however, never consult the food service or custodial staff when the issue is the medical necessity of a special diet. (*Id.*)

While Plaintiff was housed at Scotland, Defendant Shuman was aware that Plaintiff required a special diet, which Defendant Shuman recalled to be the MNT-4 special diet. (*Id.* ¶ 8.) This diet is defined as:

> Medical Nutrition Therapy Diets: MNT1 (1500 kcal), MNT2 (2000 kcal), MNT3 (2500 kcal), MNT4 (3000 kcal): The MNT diets are lower in fat (providing <30% of daily calories from fat), lower in sodium (providing between 2-4 grams of sodium), high in fiber (providing 25 or more grams of fiber), provide consistent

> carbohydrate content and calorie restrictions. All MNT meal
> patterns include an evening snack unless otherwise indicated.

(*Id.* ¶ 9.) Thus, Defendant Shuman states that Plaintiff's MNT-4 diet should have been low in fat and sodium, high in fiber and contained approximately 3,000 calories. (*Id.* ¶ 10.)

After Plaintiff had been housed at Scotland for some time, Defendant Shuman received some complaints from Plaintiff that his diet tray was not being prepared properly. (*Id.* ¶ 11.) Thereafter, Defendant Shuman immediately investigated the matter and staff informed him that Plaintiff's food trays were being prepared correctly and in accordance with the menu. (*Id.* ¶ 12.) Defendant Shuman then spoke directly to Plaintiff to try to determine his specific complaints. (*Id.* ¶ 13.) Plaintiff stated that he was not getting his proper diet, but he relied on an outdated menu to make his point to Defendant Shuman. (*Id.*) According to Plaintiff, the issue was that the MNT-4 diet called for 6 crackers, but he only received 3 or sometimes none. (*Id.*) Plaintiff confirmed that the hot portions of his meals were correct. (*Id.*) Defendant Shuman then told Plaintiff that he would investigate the issue and correct it. (*Id.* ¶ 14.)

During this same time, a letter from Plaintiff to Warden Poole about this matter was forwarded to Defendant Shuman for an investigation and response. (*Id.* ¶ 15.) In response to the situation, Defendant Shuman created a new procedure solely for Plaintiff because of his unique complaint. (*Id.* ¶ 16.) The solution was for the Food Service Manager on duty to personally double-check the tray with the MNT-4 menu, sign the "ticket," then wrap and seal the tray before putting it on the hot cart. (*Id.* ¶ 17.) Defendant Shuman then informed the Unit Manager, Assistant Unit Manager, and all relevant personnel in Plaintiff's pod area of the procedure. (*Id.* ¶ 18.)

4

When Defendant Shuman did a follow-up, Plaintiff reported difficulties with his snack bag. (*Id.* ¶ 19.)  In response, Defendant Shuman then asked the Food Service managers to put their cell phone numbers on the snack bag. (*Id.*)  Thereafter, Defendant Shuman heard nothing further from Plaintiff or his custodial staff indicating that there were any problems. (*Id.* ¶ 20.)  Defendant Shuman thought the matter had been adequately dealt with until he received the papers from this lawsuit. (*Id.* ¶ 21.)  Defendant Shuman avers that neither himself, the food service staff nor the custodial staff ignored Plaintiff's complaints. (*Id.* ¶ 22.)

Defendants Gerald and Scott are both also familiar with Plaintiff. (Gerald Decl. ¶ 5; Scott Decl. ¶ 5.)  Defendant Gerald was a unit manager of the Red Unit at Scotland during the relevant time period. (Gerald Decl. ¶ 4.)  She was aware of Plaintiff's dietary complaints, however, as a custodial staff member, Defendant Gerald has no responsibility for any special diets required by the inmates. (*Id.* ¶¶ 6-7.)  She is not involved in the prescription or determination of the need for a special diet, nor is she responsible for the preparation of the meals, including any prescribed special diet meals. (*Id.* ¶¶ 7-8)

As a unit manager, however, one of Defendant Gerald's responsibilities is to ensure that the meals are distributed to the inmates on the Red Unit which is restrictive housing. (*Id.* ¶ 9.)  During Plaintiff's time on the Red Unit, the meals were distributed properly to the inmates. (*Id.*)  Whenever Defendant Gerald learned of a complaint from an inmate regarding a special diet, she or one of her custodial staff would pass the complaint along to the food service staff. (*Id.* ¶ 10.)  Defendant Gerald ensured that Plaintiff's complaints were passed along to food service staff. (*Id.* ¶ 11.)  It was her understanding that those complaints were investigated, and the food service personnel put in place a series of checks and inspections to

5

make sure that Plaintiff's meals complied with the special diet. (*Id.* ¶ 12.) As far as Defendant Gerald was aware, those checks and inspections satisfactorily addressed Plaintiff's concerns and he received the proper meals after the food service personnel were informed of the issues. (*Id.* ¶ 13.)

Similarly, Defendant Scott, a correctional sergeant, was not involved in the determination of the need for a special diet, and he did not prepare the meals for inmates. (Scott Decl. ¶¶ 4, 7-8.) He distributed meals, and he passed along complaints, including any from Plaintiff, to his chain of command or food service staff directly. (*Id.* ¶¶ 9-11.) It was Defendant Scott's understanding that the complaints were investigated, and the food service staff put procedures in place to ensure compliance with Plaintiff's special diet. (*Id.* ¶ 12.)

In response to the summary judgment motion, Plaintiff submitted a copy of a grievance dated September 10, 2018 in which Plaintiff complains of his MNT-4 diet. (Docket Entry 67-4 at 1.) The Step One response informs Plaintiff that some of the issue may be a result of him viewing the incorrect menu, and it further informs Plaintiff that the cracker count has been addressed. (*Id.* at 2.) The response at Step Two confirmed the initial response from prison officials. (*Id.* at 3.) Plaintiff also submitted a portion of the prison's grievance policy, highlighting the sections stating that: (1) no employees involved in the grievance shall participate in the resolution process except as a witness; (2) no inmate grievances alleging sexual abuse or harassment shall be rejected; and (3) all grievances shall be processed through final disposition within 90 days after being accepted. (*See* Docket Entry 67-5.) Plaintiff also submitted a letter dated October 18, 2018 from Pamela Locklear, Assistant Superintendent of Programs at Scotland. (Docket Entry 67-6.) The letter acknowledged receipt of Plaintiff's

6

September 2018 letter regarding his improper food diet concerns and informed Plaintiff that his diet was consistent with policy guidelines. (*Id.*) Next, Plaintiff submitted a "verified statement" which he contends that Defendants "did not correct [his] constant wrong [food] trays." (Docket Entry 67-7.) Lastly, Plaintiff submitted some medical and mental health notes and documentation regarding food and nutrition management within the NCDPS. (*See* Docket Entries 68, 68-1.)

## II. DISCUSSION

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).

When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *see also Anderson*, 477 U.S. at 248-49.

**1. Deliberate Indifference**

Defendants first contend that Plaintiff cannot demonstrate that they were deliberately indifferent to Plaintiff's medical needs. (Docket Entry 59 at 8-13.) The undersigned agrees. In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates[.]" *Id.* at 832 (internal quotation and citation omitted). A successful Eighth Amendment claim contains two elements: the deprivation must be, objectively, "sufficiently serious," and the prison official must have demonstrated a "deliberate indifference to inmate health or safety." *Id.* at 834. In *Farmer*, the court held:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it.

*Id.* at 837.

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). Rather, the "deliberate indifference" prong requires Plaintiff to make "two showings:"

> First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers *should have* recognized it; they actually must have perceived the risk. Second, the evidence must show that the official in question subjectively recognized that his actions were inappropriate in light of that risk. As with the subjective awareness element, it is not enough that the official *should have* recognized that his actions were inappropriate; the official action *must have* recognized that his actions were insufficient.

*Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (internal citations and quotation marks omitted) (emphasis in original). "The subjective component therefore sets a particularly high bar to recovery." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "'Deliberate indifference entails something more than mere negligence. . . .'" *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 835). "It requires that a prison official know of and disregard the objectively serious condition, medical need, or risk of harm." *Id.* To constitute deliberate indifference, "the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).[3]

---

[3] *Miltier* has been overruled by *Farmer* to the extent that it allowed a finding of deliberate indifference upon constructive knowledge, but it is still good law for the proposition cited.

Here, there is no evidence before the Court establishing that Defendants were in violation of Plaintiff's Eighth Amendment rights. As Defendants assert, the evidence does not demonstrate that Plaintiff's meals resulted in "extreme" deprivation. *See Scinto v. Stansberry*, 841 F.3d 219, 234 (4th Cir. 2016) ("Only an 'extreme deprivation' is actionable under the Eighth Amendment."). First, Plaintiff does not allege the time frame in which the meals were allegedly improperly prepared. (*See generally* Compl.) Beyond that, Plaintiff has not adduced reasons why his meals were improper. The Complaint simply alleges that Plaintiff is on the MNT-4 diet and he is "not getting what his menu say[s]." (Compl. at 3.) As indicated by Defendant Shuman, Plaintiff had an outdated menu. (Shuman Decl. ¶ 13.) More importantly, when Plaintiff's concerns were investigated, Defendant Shuman learned that Plaintiff was complaining only about the number of crackers received and a snack bag, while the hot meal portions were adequate. (*Id.* ¶¶ 13, 19.) These complaints, even if true, do not rise to the level of extreme deprivation.

Moreover, the evidence does not demonstrate that Plaintiff's alleged deprivation or neglect was such that it was a significant risk of injury. Plaintiff's Complaint alleges that he has lost over 15 pounds without any further reference to a specific time period when such weight loss occurred. Additionally, Plaintiff asserts that his health conditions (high blood pressure, H-Pylori[4] and GERD (Gastrointestinal Reflux Disease)) have worsened. (*See* Compl.

---

[4] "H. Pylori is a common collection of bacteria that resides in the digestive system and can cause irritation or peptic ulcers." *Smith v. Lashbrook*, 671 F. App'x 381, 382 n.1 (7th Cir. 2016) (citation omitted).

at 2.) However, there is no evidence drawing a reasonable connection between the alleged deprivation and Plaintiff's worsening physical state.

In fact, Plaintiff's own evidence tells a different story. In his verified statement, Plaintiff states that between "August 2018 to Feb[ruary] 2019, Defendants in said action did not correct [Plaintiff's] constant wrong trays." (Docket Entry 67-7.) If this is the time period in which the alleged deprivation occurred, Plaintiff's own medical records reflect that his weight consistently ranged from approximately 164 pounds to 168 pounds during that time. (*See* Docket Entry 68 at 1.) Even Plaintiff's nutritional assessment form acknowledges his history of abnormal weight loss, but suggests that his weight had been stable for the year 2018 while on the MNT-4 diet. (*Id.* at 3.)

Additionally, Plaintiff's blood testing results depicting high levels of H. Pylori, glucose and cholesterol do not bolster his argument. Plaintiff's testing results date back to 2016, a time period well before August 2018 when the alleged deprivation presumably occurred. (*See* Docket Entry 2 at 12-13; Docket Entry 68 at 7.) The more recent lab recent lab results dated February 26, 2019, still showed high glucose and cholesterol levels. (*See* Docket Entry 68 at 5.) However, such evidence doesn't demonstrate *worsening* health conditions as Plaintiff alleges. In fact, while the numbers remain elevated, in some instances there was still improvement. (*Compare e.g.*, *id.* (Feb. 2019 Cholesterol Total [201], Glucose [110]) with Docket Entry 2 at 12 (Sept. 2017 Cholesterol Total [213]); Docket Entry 2 at 13 (October 2016 Glucose [137])). In sum, Plaintiff cannot demonstrate the connection between any deprivation that may have occurred and his weight loss or worsening health conditions.

11

Defendants further argue that even if Plaintiff did not receive his proper MNT-4 diet for some period of time, Defendants were not deliberately indifferent to Plaintiff's conditions or medical needs. The undersigned agrees. The evidence before the record demonstrates that Defendants were not responsible for prescribing special diets. (Shuman Decl. ¶ 7; Gerald Decl. ¶ 7; Scott Decl. ¶ 7.) Considering their respective roles—Shuman as Food Service Manager III overseeing preparation of food, and Gerald and Scott as custodial staff ensuring meals are delivered—there is no evidence that Defendants disregarded or ignored Plaintiff's needs regarding his MNT-4 food diet. Rather, the evidence shows that Defendant Shuman established two different systems to ensure that Plaintiff received the proper number of crackers in his meals and the proper snack. (Shuman Decl. ¶¶ 16-19.) Furthermore, Defendants Gerald and Scott passed along Plaintiff's complaints to food service staff. (Gerald Decl. ¶¶ 10-12; Scott Decl. ¶¶ 10-12). Thus, since no constitutional violation occurred, and summary judgment should be granted in Defendants' favor.[5]

## 2. Eleventh Amendment Immunity

Defendants also argue that the Eleventh Amendment and sovereign immunity shields them to the extent they are being sued in their official capacities. (Docket Entry 59 at 13-14.) The Eleventh Amendment prohibits actions in federal court by individuals against a state

---

[5] Briefly noted in their conclusion, Defendants state that they are protected by the doctrine of qualified immunity. (Docket Entry 59 at 15.) Notwithstanding Defendant's barebone conclusory statement without further analysis, this assertion is correct because Plaintiff has not demonstrated a violation of his constitutional right. *See Abney v. Coe,* 493 F.3d 412, 415 (4th Cir. 2007) (finding that "[i]f [an official] did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there"); *Parker v. Burris,* 2015 WL 1474909, at *8 (M.D.N.C. Mar. 31, 2015) (finding that "the absence of evidence supporting a finding that a constitutional violation occurred satisfies the first prong of the qualified immunity analysis"), *report and recommendation adopted*, No. 1:13CV488, 2015 WL 2169148 (M.D.N.C. May 8, 2015), *aff'd*, 623 F. App'x 82 (4th Cir. 2015).

unless the state has consented to suit or unless Congress has lawfully abrogated the states' Eleventh Amendment immunity. *Ballenger v. Owens*, 352 F.3d 842, 844-45 (4th Cir. 2003). The doctrine of sovereign immunity under the Eleventh Amendment applies not only to actions in which the State of North Carolina is a named defendant, but also to actions against its departments, institutions, and agencies. *DeMurry v. N.C. Dep't of Corr.*, 673 S.E.2d 374, 380-81 (N.C. Ct. App. 2009). Additionally, in North Carolina, "[a]ctions against officers of the State in their official capacities are actions against the State for the purposes of applying the doctrine of [sovereign] immunity." *Green v, Kearney*, 203 N.C. App. 260, 268, 690 S.E.2d 755, 762 (2010) (citation omitted). Indeed, "[w]here [Section 1983's] provisions allow for suit against a 'person,' and in suits for money damages, neither the state nor a state agency is deemed a 'person,' [thus] this claim cannot be maintained by plaintiff against [the State]." *Savage v. N. Carolina Dep't of Corr.*, No. 5:06-CV-171-FL, 2007 WL 2904182, at *5 (E.D.N.C. Sept. 29, 2007) (unpublished). Additionally, compensatory damages are unavailable in official capacity suits under § 1983. *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995).

Here, to the extent Plaintiff has filed suit against Defendants in their official capacities, it would be against the NCDPS and the State of North Carolina. *Green*, 203 N.C. App. at 268, 690 S.E.2d at 762. Neither has consented nor waived immunity; therefore, any monetary claims against Defendants in their official capacities should be denied. *Floyd v. N. Carolina Dep't of Corr.*, No. 1:11-CV-80-RJC, 2011 WL 1499669, at *2 (W.D.N.C. Apr. 19, 2011) ("[T]he Eleventh Amendment protects state employees acting in their official capacities from suits for damages.") (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989)); *Kelly v. Maryland*,

13

267 Fed. Appx. 209, 210 (4th Cir. 2008) (citation omitted) ("It is now well settled that a state cannot be sued under § 1983.").

**III. CONCLUSION**

In sum, viewing all assertions and inferences in the light most favorable to Plaintiff, the record demonstrates that there are no genuine issues of material fact regarding Plaintiff's Eighth Amendment claim. While Plaintiff's Complaint does not specify the exact issues with his food trays, the record demonstrates that Defendant Shuman adequately investigated and addressed Plaintiff's concerns (as presented to Shuman), and implemented reasonable solutions to ensure Plaintiff received the proper cracker count and snack bag. Additionally, Defendants Gerald and Scott properly reported Plaintiff's food complaints to food service staff. None of Plaintiff's documents filed in support of his opposition brief create a genuine issue of material fact here.[6] Accordingly,

For the reasons sated herein, **IT IS RECOMMENDED** that Defendants Mark Shuman, Eric Scott and Queen Gerald's motion for summary judgment (Docket Entry 58) be **GRANTED** and that this action be dismissed.

Joe L. Webster
United States Magistrate Judge

April 14, 2021

---

[6] The Court further notes that to the extent Plaintiff contends that Defendant Shuman violated Scotland's grievance policy by being involved with Plaintiff's grievance process (*see* Docket Entry 67 at 1), such violation is not a violation of a federal right. *See Shabazz v. Maynard*, No. CIV.A.0:02-1208-10BD, 2002 WL 32332072, at *2 (D.S.C. Nov. 25, 2002) ("[A] violation of the [prison's] grievance policy is not a violation of any federal right."), *aff'd*, 63 F.App'x 767 (4th Cir. 2003); *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir.1994) ("[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state.").